# EXHIBIT A

## APPLIED ELASTOMERICS, INCORPORATED
## PATENT LICENSE AGREEMENT

This Agreement, effective as of April 26, 2001 (the "Effective Date") is between Applied Elastomerics, Incorporated ("AEI"), a California corporation, with its principal place of business at 163 West Harris Avenue, South San Francisco, CA 94080 and Z-Man Fishing Products, Incorporated ("Company"), a South Carolina corporation, with its principal place of business at 911 Commerce Circle, Hanahan, SC 29407.

### RECITALS

WHEREAS, AEI owns and has rights to license certain Patent Rights (as later defined herein), covering certain compositions, composites, and articles thereof.

WHEREAS, Company manufactures and sells various fishing lure products, and Company markets such products throughout the world.

WHEREAS, Company desires to obtain an exclusive Patent License for the products specified on Schedule B and has represented to AEI, to induce AEI to enter into this Exclusive Patent License Agreement, that Company shall commit itself to a thorough, vigorous and diligent program of exploiting the Patents Rights;

NOW, THEREFORE, AEI and Company hereby agree to this Exclusive Patent License Agreement as follows:

1. Definitions.

    1.1. "Affiliate" shall mean any legal entity (such as a corporation, partnership, or limited liability company) that is related to Company as a parent company, a subsidiary or a sister company, including, but not limited to, Color Technologies, Incorporated and The Inter-Tech Group, Incorporated.

    1.2. "Field" shall mean the fishing lure field limited to Licensed Products which are listed and described on Schedule B and incorporated herein by reference.

    1.3. "Licensed Product(s)" shall mean one or more fishing lure products in the Field which is developed, manufactured, have manufactured, marketed, or purchased from a third party for marketing by Company under Company's specifications and trademarks or under another's trademarks as listed by product item number, described, defined, and with the designation of the type of gel composition used on Schedule B as of the Effective Date or later added as a New Licensed Product (defined in §1.4, and in accordance with §4.4, and §4.5, below), that cannot be manufactured made, used, offered for sale, leased, or sold, in whole or in part, without infringing one or more of the Patent Rights.

        (a) The Licensed Product(s) as defined herein shall be listed with or without the designation "Restricted under §2.2(a)" following the item numbers, and described in Schedule B specified as follows:

        (b) for a Licensed Product to be included in Schedule B a product must be requested by Company (pursuant to §2.2(a), §4.4 and §4.5), reviewed by AEI and determined not to be in conflict with any product of Third Party Licensees (as defined in §1.12 and §2.4).

        (c) Company may from time to time add additional products to Schedule B in accordance with §4.4 and §4.5. For a Licensed Product to be included in Schedules B, the product must be requested by Company pursuant to §4.4 and §4.5; and any product which is requested by Company for inclusion in Schedule B shall be first reviewed and reasonably determined by AEI for inclusion or exclusion on Schedules B in accordance with §4.4 and §4.5.

    1.4. "New Licensed Product" shall mean one or more Licensed Product added to Schedule B in accordance with §4.4 and §4.5 after the Effective Date of this Agreement.

    1.5. "Licensed Product Date" shall mean the Effective Date of this Agreement for Licensed Product(s) listed on Schedule B on the Effective Date of this Agreement or the date a New Licensed Product is approved and added to Schedule B.

    1.6. "Net Revenues" shall mean the gross amount billed or invoiced and collected by Company and its Affiliates for Licensed Products actually sold during the subject accounting period, less the following: (i) customary trade, quantity, or cash discounts; (ii) amounts repaid or credited by reason of rejection or return; (iii) to the extent separately stated on purchase orders, invoices, or other documents of sale, any taxes or other governmental charges levied on the production, sale, transportation, delivery, or use of a Licensed Product which is paid by or on behalf of Company; and (iv) outbound transportation costs prepaid or allowed and costs of insurance in transit.

No deductions shall be made for commissions paid to individuals whether they be with independent sales agencies or regularly employed by Company and on its payroll, or for cost of collections. Net Revenues shall occur on the date of invoice or billing for a Licensed Product actually sold during the subject accounting period. If a Licensed Product is distributed, billed or

1

invoiced to Affiliates or others at a discounted price that is substantially lower than the customary price charged by Company to independent third parties, Net Revenues shall be calculated based on the invoice amount of the Licensed Product to an independent third party during the same Reporting Period or, in the absence of such invoice, on the fair market value of the Licensed Product as mutually determined and understood by the parties in good faith.

Company nor an Affiliate shall accept non-monetary consideration for any Licensed Products without the prior written consent of AEI.

1.7. "Patent Rights" shall mean:

(a) the United States and international patents listed on Schedule A including any other United States and international patents in which the claims of such patents read on the Licensed Products and are acquired or otherwise owned by AEI during the term of this Agreement in which the Valid Claims (as defined in §1.8) of said patents read on the Licensed Products;

(b) any divisionals, continuations, and continuation-in-part patents (and their relevant international equivalents) of any patent noted in §1.7(a) which are directed to claimed subject matter of the patents listed on Schedule A, and the resulting patents; and

(c) any patents resulting from reissues, reexaminations, or extensions (and their relevant international equivalents) of the patents described in (a) and (b) above.

1.8. "Valid Claims" shall mean a claim of any patent that issues on a pending patent application, and any claim in an un-expired patent or patent whose expiration date has been extended by law, contained in the Patent Rights, so long as such claim has not been (i) disclaimed, withdrawn, cancelled or abandoned by AEI, or (ii) finally rejected or held invalid by a decision of a patent granting authority in a reexamination or reissue procedure, or (iii) held invalid or unenforceable in a decision of a court or competent body having jurisdiction.

1.9. "Reporting Period" shall begin on the first day of each calendar quarter and end on the last day of such calendar quarter; except that the first and last Reporting Periods under this Agreement may be partial calendar quarters in that the first Reporting Period shall begin on the Effective Date, and the last Reporting Period shall end on the later of (i) the date of termination of this Agreement or (ii) the date upon which Company completes and sells its remaining work-in-progress and inventory of Licensed Products pursuant to §8.6.

1.10. "Term" shall mean the term of this Agreement as further defined in §8.1.

1.11. "Territory" shall mean worldwide.

1.12. "Third Party Licensees" shall mean third parties who are licensed by AEI in the Field to make, use or sell fishing lure products in the Field.

1.13. "AEI Technology" shall mean materials, any information relating to manufacturing techniques, know-how, processes, developments, experimental works, works in progress, trade secrets, or any other matter relating to the business of AEI or developed by AEI in the Field related to Licensed Product(s). Additionally, any Technology which is provided by AEI to Company or by Company to AEI and which falls within the definition of "Confidential Information" provided in the Confidentiality Agreement of even date between AEI and Company shall be maintained in confidence by Company and AEI in accordance with said Confidentiality Agreement.

1.14. "Sublicense" shall mean a third party licensed by Company under no lesser terms than under the provisions of this Agreement.

2. Grant of Rights.

2.1. License Grants. Subject to the terms of this Agreement, AEI hereby grants to Company and its Affiliates:

(a) a nonexclusive, royalty bearing license under its rights in the Patent Rights, to the extent not prohibited by other patents, to develop, make, have made, use, offer to sell, sell, lease, export and import Licensed Products in the field and throughout the Territory;

(b) an nonexclusive license to use AEI Technology in connection with the manufacture, use, and sale of Licensed Products worldwide.

2.2. Exclusivity by Restriction.

(a) Subject to the royalty and minimum royalty payments set forth in §4.6, AEI agrees not to license any third party to manufacture or sell a Licensed Products as described in Schedule B marked "Restricted under §2.2(a)".

2

(b) <u>The restriction of §2.2(a) shall apply to</u> a third party or a Third Party Licensee in the Field after the date of this Agreement or after the appropriate marked Licensed Product Date consistent with §1.4, §2.4, §4.4, and §4.5. Should such third party or Third Party Licensee notify AEI of its desire to market a product which may be similar to a Licensed Product restricted under §2.2(a), AEI agrees to discuss any potential conflicts such third party's product may have an impact on Company's Licensed Product. The disclosure by AEI to Company of third party's or Third Party Licensee's products under this Section shall be limited to general terms, without disclosing any confidential information of such third party or Third Party Licensee. To the extent consistent with §1.4, §2.4, §4.4, and §4.5. AEI shall not license any third party or Third Party Licensee to market a product substantially similar to Licensed Products marked restricted under §2.2(a)) in the Field.

(c) <u>Preexisting Rights Possessed by Third Party Licensee.</u> Such restriction with respect to Patent Rights (§1.7 (a)-(d)) shall not apply, however, to Third Party Licensee(s) whom AEI has licensed prior to the date of this Agreement.

2.3. <u>Authority.</u> AEI represents and warrants:

(a) in respect to the Patent Rights that it has legal power to extend the rights granted to Company in this Agreement; and

(b) AEI has taken all steps necessary to protect and preserve the Patent Rights of which AEI is assignee of record of patents relevant to Licensed Products and is not aware of the laps of any of such patents.

2.4. <u>Regarding Third Party Licensees.</u>

(a) that AEI has not made and will not make any commitments to others inconsistent with or in derogation of the rights granted to Company under §2.2(a);

(b) that AEI has not granted any Third Party Licensee an exclusive license for Licensed Products; and

(c) that in the event (during the term of this Agreement) AEI by assignment assigns any rights in the Patent Rights for Licensed Product(s) to a Third Party Assignee, AEI agrees that said assignment will include a provision that such Third Party Licensee and such Third Party Assignee will not bring suit for infringement against Company for exercising its rights under §2.1 or §2.2(a) in accordance with the terms of this Agreement.

(d) With respect to this Agreement, no license is granted herein by AEI which conflicts with one or more products of any Third Party Licensees.

2.5. <u>Sublicense.</u> The licenses herein granted may be sublicensed by Company with written approval from AEI, such sublicense may extend to affiliates of Company in all cases, Company guarantees the observance and performance by each such affiliates or approved sublicense of all obligations and duties imposed upon Company under the provisions of this Agreement. AEI will not withhold its consent, provided that such party is not a past or present party in breach of an agreement with AEI or have dealt with AEI and in AEI's reasonable judgment, such dealing was in bad faith. Upon Company entering into a sublicense agreement, Company shall deliver an original executed sublicense agreement to AEI for its written approval.

2.6. <u>No Additional Rights.</u> Nothing in this Agreement shall be construed to confer any rights upon Company by implication, estoppel, or otherwise as to any technology or patent rights of AEI or any other entity other than the Patent Rights and AEI Technology, regardless of whether such rights shall be dominant or subordinate to any Patent Rights.

3. **Company Obligations Relating to Commercialization.**

3.1. <u>Diligence Requirements.</u>

(a) Company shall use commercially reasonable efforts, or shall cause its Affiliates to use commercially reasonable efforts, to develop Licensed Products and to introduce Licensed Products into the applicable commercial market; thereafter, Company or its Affiliates shall make Licensed Products reasonably available to the public. Specifically, Company or Affiliate shall exert commercially reasonable efforts to fulfill the following obligations: Company will commence marketing the already listed Licensed Products by October 1, 2001 or (6) months from any New Licensed Product Date to begin marketing the such New Licensed Product(s). Should Company fail to market any Licensed Product(s) within the time period, the appropriate Licensed Product(s) will automatically be dropped (without recourse) from Schedule B. In such an event, however, Company can request to add a New Licensed Product(s) which may be the same as the "soon to be dropped Licensed Product(s)" by making such a request and paying the appropriate Product Fee Payment prior to the automatic drop date of the existing Licensed Product(s) without the need for AEI to conduct a product(s) conflict review, thereby extending the marketing date for another twelve (12) month period. If, in AEI's reasonable judgment Company is not exerting commercially reasonably efforts for a particular line of Licensed Product(s) to develop and market it, within such 6-month period, AEI may require that such Licensed Product(s) be removed (without recourse) from Schedule B.

(b) Company shall make a first commercial sale of a Licensed Product by October 1, 2001 or within the twelve months period from any New Licensed Product Date as specified on the applicable Schedule B.

3

(c) Company shall make Net Revenues from Licensed Products as described in Schedule B marked "Restricted under §2.2(a)" according to the following schedule:

| Year | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|------|-------------|-------------|-------------|-------------|
| 2002 | $150,000 | $150,000 | $150,000 | $150,000 |
| 2003 | $1,250,000 | $1,250,000 | $1,250,000 | $1,250,000 |
| 2004 | $1,250,000 | $1,250,000 | $1,250,000 | $1,250,000 |
| 2005 | $1,250,000 | $1,250,000 | $1,250,000 | $1,250,000 |

each year thereafter at least $5,000,000.

(d) As part of the diligence requirements, for Licensed Products (marked "Restricted under §2.2(a)") on Schedule B which Company markets in accordance with the terms of this Agreement, Company shall pay to AEI from the Effective Date of this Agreement the minimum royalties set forth in §4.6 below.

3.2.    Indemnification.

(a) Indemnitees. Company shall indemnify, defend, and hold harmless AEI and its trustees, officers, employees, and agents and their respective successors, heirs and assigns (the "Indemnitees"), against any liability, damage, loss, or expense (including reasonable attorneys fees and expenses) incurred by or imposed upon any of the Indemnitees in connection with any claims, suits, actions, demands or judgments arising out of any theory of liability (including without limitation actions in the form of tort, warranty, or strict liability and regardless of whether such action has any factual basis) concerning any product, process, or service that is made, used, sold, or imported pursuant to any right or license granted under this Agreement.

(b) Procedures. The Indemnitees agree to provide Company with prompt written notice of any claim, suit, action, demand, or judgment for which indemnification is sought under this Agreement. Company agrees, at its own expense, to provide attorneys reasonably acceptable to AEI to defend against any such claim. The Indemnitees shall cooperate fully with Company in such defense and will permit Company to conduct and control such defense and the disposition of such claim, suit, or action (including all decisions relative to litigation, appeal, and settlement); provided, however, that any Indemnitee shall have the right to retain its own counsel, at the expense of Company, if representation of such Indemnitee by the counsel retained by Company would be inappropriate because of actual or potential differences in the interests of such Indemnitee and any other party represented by such counsel. Company agrees to keep AEI informed of the progress in the defense and disposition of such claim and to consult with AEI with regard to any proposed settlement.

(c) Insurance. Company shall obtain and carry in full force and effect commercial general liability insurance, including product liability and errors and omissions insurance which shall protect Company and Indemnitees with respect to events covered by §3.2(a) above. Such insurance shall be issued by an insurer pre approved by AEI, such approval not to be unreasonably withheld, shall list AEI as an additional named insured thereunder, shall be endorsed to include product liability coverage, and shall require thirty (30) days written notice to be given to AEI prior to any cancellation or material change thereof. The limits of such insurance shall not be less than One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for bodily injury including death; One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for property damage; and One Million Dollars ($1,000,000) per occurrence with an aggregate of Three Million Dollars ($3,000,000) for errors and omissions. In the alternative, Company may self insure subject to prior approval of AEI Company shall provide AEI with Certificates of Insurance evidencing compliance with this Section. Company shall continue to maintain such insurance or self insurance after the expiration or termination of this Agreement during any period in which Company or any Affiliate or Sublicensee continues (i) to make, use, or sell a product that was a Licensed Product under this Agreement or (ii) to perform a service that was a Licensed Process under this Agreement, and thereafter for a period of five (5) years.

3.3.    Use of AEI or Company Name. Neither Company nor AEI shall use any of the other's name, trademark or service mark, or any variation, adaptation, abbreviation thereof, nor discloses any terms of this Agreement in any promotional material or other public announcement without the prior written consent of the other. The foregoing notwithstanding, without the consent of the other AEI and Company may state that it is licensor or licensee respectively of licensed by AEI under one or more of the patents and/or patent applications comprising the Patent Rights and may disclose such information in any prospectus, offering memorandum, or other document or filing required by applicable securities laws or other applicable law or regulation.

3.4.    Marking of Licensed Products. To the extent commercially feasible and consistent with prevailing business practices, Company shall mark, and shall cause its Affiliates to mark, all Licensed Products that are manufactured or sold under this Agreement with the number of each issued patent under the Patent Rights that applies to such Licensed Product.

3.5.    Compliance with Law. Each of AEI and Company shall use reasonable commercial efforts to comply with, and shall ensure that its Affiliates and licensees use reasonable commercial efforts to comply with, all commercially material local, state, federal, and international laws and regulations relating to the development, manufacture, safety, use, and sale of Licensed Products.

4

4. **Consideration for Grant of Rights.**

    4.1. _License Issue Fee._ In partial consideration of the rights granted Company under this Agreement, Company shall pay to AEI on the Effective Date a license issue fee of Twenty Five Thousand ($25,000.00) dollars. The license fee payment is non-refundable, however Twelve Thousand Five Hundred ($12,500.00) dollars of the license issue fee may be credited to running royalties earned on any Licensed Product during the Term of this Agreement. The license fee payment is not creditable against any other payments due to AEI under this Agreement.

    4.2. _Running Royalties._ In partial consideration of the rights granted Company under this Agreement, Company shall pay to AEI a running royalty of:

    (a) Eight percent (8.0%) of Net Revenues for all Licensed Products on Schedule B marked "Restricted under §2.2(a)"; and

    (b) Six percent (6.0%) of Net Revenues for all other Licensed Products on Schedule B not marked "Restricted under §2.2(a)".

    (c) In the event any Licensed Product is manufactured, directly or indirectly, solely using AEI Technology, but without the protection of any valid Licensed Patents in a given country covered by a license granted under this License Agreement, the royalty rate shall be Three percent (3%) for Licensed Product.

    4.3. _No Multiple Royalties._ If the manufacture, use, lease, or sale of any Licensed Product is covered by more than one of the Patent Rights, multiple royalties shall not be due.

    4.4. _Product Fee Payment._ For each additional New Licensed Product(s) added to Schedule B following the first Licensed Product(s) as provided for in §4.5, Company shall pay AEI a non-refundable Product Fee of One Thousand Dollars ($1,000.00) for each new Licensed Product(s) so added.

    4.5. _New Licensed Product Notices and Samples._ Prior to marketing of any New Licensed Product, Company shall notify AEI in writing of its desire to market any New Licensed Product stating in such notice the description of the New Licensed Product it wishes to add to Schedules B, requesting marking under §2.2(a), and the marketing date(s), if any. Company shall, as provided for in §4.4, include with such notice the appropriate Product Fee payment. AEI will have an initially have two weeks from the date of such notice to determine if company's notification to develop and market such New Licensed Product conflicts with any product already licensed to any Third Party Licensees. If AEI needs additional time to review or evaluate whether a conflict exists, AEI shall have an additional, automatic one month period of time to respond to Company upon written notice to Company, and thereafter AEI can request have any reasonable amount of an additional amount of time thereafter as requested by AEI in writing notifying Company of the additional time needed to make its determination and such request for any additional reasonable amount of time shall not be denied agreed upon by Company. AEI will add the New Licensed Product in Schedules B provided such New Licensed Product is not in conflict with any product licensed to Third Party Licensees. Any failure by AEI to respond to such notification within the two-week period shall be deemed a confirmation by AEI that it will add the applicable New Licensed Product to Schedule B hereto. In the event of conflict, AEI will notify Company in writing and refund to Company the Product Fee payment. If there is no conflict, Company shall exert commercially reasonable efforts to begin marketing such New Licensed product within the next twelve (12) months. Should Company fail to exert such efforts to market the New Licensed Product within the time period, the New Licensed Product will automatically be dropped (without recourse) from Schedules B. Before commencing the sale of any New Licensed Product, Company shall send to AEI without charge six (6) samples and a up-to-date description and definition of the New Licensed Product identified by trademark and Item number. Upon receipt of the samples, AEI will examine and compare the samples and its up-to-date description and definition with the corresponding New Licensed Product as defined, described and listed on Schedules B to determine if the sample is substantially the same as the New Licensed Product listed on the Schedule. In the event that the sample is materially different from the listed new Licensed product, then the description and definition of the New licensed product listed on Schedule B will be amended to conform to the corresponding sample and its up-to-date description and definition submitted by Company. In the event AEI determines that the function and use of the submitted samples are different or the samples are materially different from the description and definition listed on Schedule B, and the samples conflict with any products already licensed to any Third Party Licensees, AEI will notify Company in writing of its determination and Company agrees to abide by such determination and abandon marketing any conflicting products (as represented by the conflicting sample product submitted by Company to be conflicting).

    4.6. _Minimum Royalties._ In accordance with §2.2 and §3.01(c), payment of the minimum royalties entitles Company to maintain the restriction for one or more Licensed Products on Schedule B.

    (a) Company shall pay to AEI from the Effective Date of this Agreement the minimum royalties to be paid each calendar quarter as follows:

| Year | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|------|-------------|-------------|-------------|-------------|
| 2002 | $12,500 | $12,500 | $12,500 | $12,500 |
| 2003 | $100,000 | $100,000 | $200,000 | $200,000 |
| 2004 | $100,000 | $100,000 | $200,000 | $200,000 |
| 2005 | $100,000 | $100,000 | $200,000 | $200,000 |

and thereafter One Hundred Thousand Dollars ($50,000.00) for the 1st calendar quarter, One Hundred Thousand Dollars ($100,000.00) for the 2nd calendar quarter, Two Hundred Thousand Dollars ($200,000.00) for the 3rd calendar quarter, Two Hundred Thousand Dollars ($200,000.00) for the 4th calendar quarter, for the remainder of the term of this Agreement and any extensions thereof or upon removal of the restriction for all License Products under §2.2(a). Such minimum shall not apply to include the sell-off period provided by §8.6 upon termination of this Agreement;

(b) Company may terminate its obligation to pay any remaining minimum royalties for any reason at any time by giving Ninety (90) days prior written notice to AEI under §10.9, which would remove the restriction under §2.2(a) and revert the running royalty in §4.2(a) to six percent (6%); and

(c) All amounts submitted to AEI under §4.6 shall be creditable by Company against any running royalty owed under §4.2. The minimum royalty in this Section, the license fee in §4.1, and the running royalty in §4.2 constitute the entire royalty obligation in connection with the license granted in §2.1 and §2.2(a).

5. **Reports: Payments: Records.**

5.1. *Frequency of Reports.* After First Commercial Sale. After the first commercial sale of any Licensed Product, Company shall deliver reports to AEI within sixty (60) days of the end of each Reporting Period, containing information required under §5.2 below, concerning the immediately preceding Reporting Period.

5.2. *Content of Reports and Payments.*

(a) Each report delivered by Company to AEI shall contain at least the following information for the immediately preceding Reporting Period:

(i) The number of Licensed Products sold, or distributed by Company, its Affiliates to independent third parties in each country;

(ii) The gross price charged by Company, its Affiliates for each Licensed Product;

(iii) Calculation of Net Revenues for the applicable Royalty Period in each country, including a listing of applicable deductions and any credit in accordance with §4.6;

(iv) Total royalty payable on Net Revenues in U.S. dollars, together with the exchange rates used for conversion; and

(b) In making each report under this Section, Company shall certify that the report contains a full accounting of sales for the applicable Royalty Period and such accounting is complete and accurate. If no amounts are due to AEI for any Reporting Period, the report shall so state. Concurrent with each report, Company shall remit to AEI any payments under §4.1, §4.2, §4.4, and §4.6 due for the applicable Reporting Period.

(c) Company shall report all names and mailing addresses of any new vendor(s) contracted to make Licensed Product(s) during the subject reporting period.

5.3. *Payments in U.S. Dollars.* All payments due under this Agreement shall be payable in United States dollars. Conversion of foreign currency to U.S. dollars shall be made at the conversion rate existing in the United States (as reported in the Wall Street Journal) on the last working day of the calendar quarter preceding the applicable Royalty Period. Such payments shall be without deduction of exchange, collection, or other charges, and, specifically, without deduction of withholding or similar taxes or other government imposed fees or taxes, except as defined in Net Revenues.

5.4. *Financial Statements.* On or before the ninetieth (90th) day following the close of Company's fiscal year, Company shall provide AEI with Company's financial statements for the preceding fiscal year including, at a minimum, a balance sheet and an income statement, certified by Company's chief financial officer or by an independent auditor. All such financial statements shall be considered Company's Confidential Information.

5.5. *Payments in Other Currencies.* If by law, regulation, or fiscal policy of a particular country, conversion into United States dollars or transfer of funds of a convertible currency to the United States is restricted or forbidden, Company shall give AEI prompt written notice of such restriction, which notice shall satisfy the sixty-day payment deadline described in §5.2. Company shall pay any amounts due AEI through whatever lawful methods AEI reasonably designates; provided, however, that if AEI fails to designate such payment method within thirty (30) days after AEI is notified of the restriction, Company may deposit such payment in local currency to the credit of AEI in a recognized banking institution selected by Company and identified by written notice to AEI, and such deposit shall fulfill all obligations of Company to AEI with respect to such payment.

5.6 *Records.* Company shall maintain, and shall cause its Affiliates to maintain, complete and accurate records relating to the rights and obligations under this Agreement and any amounts payable to AEI in relation to this Agreement, which records shall contain sufficient information to permit AEI to confirm the accuracy of any reports delivered to AEI under §5.2 and

6

compliance in other respects with this Agreement. The relevant party shall retain such records for at least five (5) years following the end of the calendar year to which they pertain, during which time AEI, or AEI's appointed agents, shall have the right, at AEI's expense, to inspect such records during normal business hours to verify any reports and payments made or compliance in other respects under this Agreement. In the event that any audit performed under this Section reveals an underpayment in excess of ten percent (10%), Company shall bear the full cost of such audit and shall remit any amounts due to AEI within thirty (30) days of receiving notice thereof from AEI.

5.7. **Late Payments.** Any payments by Company that are not paid on or before the date such payments are due under this Agreement shall bear interest, to the extent permitted by law, at two percentage points above the prime rate of interest as reported in the Wall Street Journal on the date payment is due, with interest calculated based on the number of days that payment is delinquent. In addition to the interest provision of this Section as to late royalty payments, the following shall be the penalty due to fraud or false statements in connection with any unpaid royalties for which AEI has provided Company with written notification and which remain uncorrected or unpaid (with interest) under this Section for more than thirty (30) days from the date of such notification: A penalty of three (3) times the amount of royalty underpayment due to fraud or false statements which are unreported and unpaid falling within the term of this Agreement which penalty shall be considered as the sole compensation and damages for the unreported infringing sales and such sales shall be treated as infringing sales in accordance with 35 U.S.C. 284. Company shall also pay any reasonable attorney fees and expenses incurred by AEI as a result of such fraud or false statements and misrepresentations.

5.8. **Method of Payment.** All payments under this Agreement should be made payable to "Applied Elastomerics, Incorporated" and sent to the address identified below. Each payment should reference this Agreement and identify the obligation under this Agreement that the payment satisfied.

6. **Patent Prosecution and use of Information.**

6.0. **Responsibility for Patent Rights.** AEI shall prepare, file, prosecute, and maintain all of the Patent Rights. Company shall have reasonable opportunities to advise AEI and shall cooperate with AEI in such filing, prosecution and maintenance, at AEI's expense. Such cooperation includes, without limitation, (i) promptly executing all reasonable and appropriate papers and instruments to enable AEI to file, prosecute, and maintain such Patent Rights in any country; and (ii) promptly informing AEI of matters that may affect the preparation, filing, prosecution, or maintenance of any such Patent Rights (such as becoming aware of an additional inventor who is not listed as an inventor in a patent application).

6.1. AEI shall be free to use any information supplied by Company under this Agreement in evaluating and enforcing AEI's rights under this Agreement and Company's compliance therewith, and in so doing may disclose information to its attorney, auditor or other professional advisor provided such party signs a comparable secrecy agreement.

7. **Infringement.**

7.1. **Notification of Infringement.** Each party agrees to provide written notice to the other party promptly after becoming aware of any infringement of the Patent Rights.

7.2. **Company Right to Prosecute.** So long as Company remains the only licensee of the Licensed Products under the Patent Rights in the Field, Company, to the extent permitted by law, shall have the right, under its own control and at its own expense, to prosecute any third party infringement of the Patent Rights or to defend the Patent Rights in any declaratory judgment action brought by a third party that alleges invalidity, unenforceability, or non infringement of the Patent Rights. Prior to commencing any such action, Company shall consult with AEI and shall consider the views of AEI regarding the advisability of the proposed action. Company shall not enter into any settlement, consent judgment, or other voluntary final disposition of any infringement action under this Section without the prior written consent of AEI.

7.3. **Recovery.** Any recovery obtained in an action brought by Company under §7.2 shall be distributed as follows: (i) each party shall be reimbursed for any expenses incurred in the action (including the amount of any royalty or other payments withheld from AEI as described below), (ii) as to ordinary damages, Company shall receive an amount equal to its lost profits or a reasonable royalty on the infringing sales (whichever measure of damages the court shall have applied), and Company shall pay to AEI based upon such amount a reasonable approximation of the royalties and other amounts that Company would have paid to AEI if Company had sold the infringing products rather than the infringer, and (iii) as to special or punitive damages, the parties shall share equally in any award. Company may offset a total of fifty percent (50%) of any expenses incurred under this Section and §7.2 against any running royalty payments due to AEI under this Agreement, provided that in no event shall the running royalty payments under §4.2, when aggregated with any other offsets and credits allowed under this Agreement, be reduced by more than fifty percent (50%) in any Reporting Period.

7.4 **AEI as Indispensable Party.** AEI shall permit any action under §7.2 to be brought in its name, including being joined as a party-plaintiff, if required by law, provided that Company shall hold AEI harmless from, and if necessary indemnify AEI against, any costs, expenses, or liability that AEI may incur in connection with such action.

7.5. **AEI Right to Prosecute.** In the event that Company fails to initiate an infringement action within a reasonable time after it first becomes aware of the basis for such action, or to answer a declaratory judgment action within a reasonable time

7

after such action is filed, or if Company does not have standing to bring an action under this Section, AEI shall have the right, at its sole discretion, to prosecute such infringement or answer such declaratory judgment action, under its sole control and at its sole expense, and any recovery obtained shall be given to AEI.

7.6. **Cooperation.** Each party agrees to cooperate fully in any action under this Section which is controlled by the other party, provided that the controlling party reimburses the cooperating party promptly for any costs and expenses incurred by the cooperating party in connection with providing such assistance.

8. **Term and Termination.**

8.1. **Term.** The duration of the licenses granted herein shall be for the period of five (5) years from the date of this Agreement or upon termination of the Agreement whichever occurs first.

8.2. **Renewal Terms.** Company shall have the option of extending this Agreement beyond the original five (5) year term on a year by year basis for one twelve (12) month period at a time provided Company is not in breach and has meet the reporting and payment obligations under §4.1, §4.2, §4.4, § 4.6, §5.2, and §5.6.

8.3. **Voluntary Termination by Company.** Company shall have the right to terminate this Agreement, for any reason, (i) upon at least six (6) months prior written notice to AEI, such notice to state the date at least six (6) months in the future upon which termination is to be effective, and (ii) upon payment of all amounts due to AEI through such effective date.

8.4. **Termination for Default.**

(a) **Nonpayment.** In the event Company fails to pay any amounts due and payable to AEI hereunder, and fails to make such payments within thirty (30) days after receiving written notice thereof, AEI may terminate this Agreement upon written notice to Company. Company shall have only one opportunity to benefit from the thirty (30) day cure period; any subsequent breach for nonpayment by Company will entitle AEI to terminate this Agreement immediately upon written notice to Company, without the thirty-day cure period.

(b) **Material Breach.** In the event Company or AEI commits a material breach of its obligations under this Agreement, except for breach as described in §8.4(a), and fails to cure that breach within sixty (60) days after receiving written notice thereof, the non-breaching party may terminate this Agreement upon written notice to the other. A license granted by AEI to a third party that affects the restriction granted to Company under §2.2(a) shall constitute a material breach and, if not cured in accordance with this Section, shall result in the cancellation of the minimum royalty obligations upon Company set forth in §4.6 and shall cause the running royalty to be reverted to 6% and removal of the restriction under §2.2(a).

(c) **Cease Make, Use And Sell.** Company agrees that upon the termination of this Agreement as herein provided, it will forthwith cease to manufacture and/or sell Licensed Products that are covered by a Valid Claim and will not for the period of time during which AEI remains assignee and has legal power of the patents specified in the Patent Rights and that such patents are enforceable and valid, engage either directly or indirectly in the manufacture of Licensed Products, unless this Agreement is renewed or extended, or a new agreement has been entered into.

8.5. **Force Majeure.** Neither party will be responsible for delays resulting from causes beyond the reasonable control of such party, including without limitation fire, explosion, flood, war, strike, or riot, provided that the non performing party uses commercially reasonable efforts to avoid or remove such causes of nonperformance and continues performance under this Agreement with reasonable dispatch whenever such causes are removed.

8.6. **Effect of Termination.** The following provisions shall survive the expiration or termination of this Agreement: Sections 1 and 9, including §1.3, §1.4, §1.6, §1.7, §1.8, §1.9, §1.12, §1.13, §1.14, §2.2, §2.24, §2.5, §2.3, §3.2, §3.3, §3.4, §3.5, §4.1, §4.2, §4.4, §4.6, §5.1, §5.2, §5.3, §5.4, §5.5, §5.6, §5.7, §5.8, §6.0, §6.1, §7.1, §7.2, §7.3, §7.4, §7.5, §7.6, §8.4, §8.6, §9.1, §9.2, §9.3, §10.1, §10.2, §10.6, and §10.8. Upon the early termination of this Agreement, Company and its Affiliates may complete and sell any work-in-progress and inventory of Licensed Products that exist as of the effective date of termination, provided that (i) Company is current in payment of all amounts due AEI under this Agreement, (ii) Company pays AEI the applicable running royalty or other amounts due on such sales of Licensed Products in accordance with the terms and conditions of this Agreement, and (iii) Company and its Affiliates shall complete and sell all work-in-progress and inventory of Licensed Products within six (6) months after the effective date of termination.

9. **Dispute Resolution.**

9.1. **Mandatory Procedures.** The parties agree that any dispute arising out of or relating to this Agreement shall be resolved solely by means of the procedures set forth in this Section, and that such procedures constitute legally binding obligations that are an essential provision of this Agreement; provided, however, that all procedures and deadlines specified in this Section may be modified by written agreement of the parties. If either party fails to observe the procedures of this Section, as may be modified by their written agreement, the other party may bring an action for specific performance of these procedures in any court of competent jurisdiction.

8

9.2. <u>Dispute Resolution Procedures</u>.

(a) <u>Negotiation</u>. In the event of any dispute arising out of or relating to this Agreement, the affected party shall notify the other party, and the parties shall attempt in good faith to resolve the matter within ten (10) days after the date of such notice (the "Notice Date"). Any disputes not resolved by good faith discussions shall be referred to the Technology Licensing Office at AEI and to a senior executive for the Company (collectively, the "Executives"), who shall meet at a mutually acceptable time in San Mateo County, California within thirty (30) days after the Notice Date and attempt to negotiate a settlement.

(b) <u>Mediation</u>. At the earlier of: (a) the matter remains unresolved within sixty (60) days after the Notice Date, or if the Executives fail to meet within thirty (30) days after the Notice Date, either party may initiate mediation upon written notice to the other party, whereupon both parties shall engage in a mediation proceeding under the then current Center for Public Resources ("CPR") Model Procedure for Mediation of Business Disputes, except that specific provisions of this §9 shall override inconsistent provisions of the CPR Model Procedure. The mediator will be selected from the CPR Panels of Neutrals. If the parties cannot agree upon the selection of a mediator within ninety (90) days after the Notice Date, then upon the request of either party, the CPR shall appoint the mediator. The parties shall attempt to resolve the dispute through mediation until one of the following occurs: (i) the parties reach a written settlement; (ii) the mediator notifies the parties in writing that they have reached an impasse; (iii) the parties agree in writing that they have reached an impasse; or (iv) the parties have not reached a settlement within one hundred and twenty (120) days after the Notice Date.

(c) <u>Trial Without Jury</u>. If the parties fail to resolve the dispute through mediation, or if neither party elects to initiate mediation, each party shall have the right to pursue any other remedies legally available to resolve the dispute, provided, however, that the parties expressly waive any right to a jury trial in any legal proceeding under §9.

9.3. <u>Preservation of Rights Pending Resolution</u>.

(a) <u>Performance to Continue</u>. Each party shall continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of or relating to this Agreement; provided, however, that a party may suspend performance of its obligations during any period in which the other party fails or refuses to perform its obligations. Nothing in this Section is intended to relieve Company from its obligation to make payments pursuant to §4.1, §4.2, §4.4, §4.6, and §6 of this Agreement.

(b) <u>Provisional Remedies</u>. Although the procedures specified in §9 are the sole and exclusive procedures for the resolution of disputes arising out of or relating to this Agreement, either party may seek a preliminary injunction or other provisional equitable relief if, in its reasonable judgment, such action is necessary to avoid irreparable harm to itself or to preserve its rights under this Agreement.

(c) <u>Statute of Limitations</u>. The parties agree that all applicable statutes of limitation and time-based defenses (such as estoppel and laches) shall be tolled while the procedures set forth in §9.2.(a) and §9.2(b) are pending. The parties shall cooperate in taking any actions necessary to effectuate this result.

10. Miscellaneous.

10.1. <u>No Representations or Warranties</u>. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER COMPANY NOR AEI MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND CONCERNING THE PATENT RIGHTS, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, VALIDITY OF PATENT RIGHTS CLAIMS, WHETHER ISSUED OR PENDING, AND THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE. Specifically, and not to limit the foregoing, AEI makes no warranty or representation (i) regarding the validity or scope of the Patent Rights, (ii) that the exploitation of the Patent Rights or any Licensed Product will not infringe any patents or other intellectual property rights of AEI or of a third party, and (iii) that AEI or a third party is not currently infringing or will not infringe the Patent Rights.

IN NO EVENT SHALL COMPANY, ITS TRUSTEES, DIRECTORS, OFFICERS, EMPLOYEES AND AFFILIATES OR AEI, ITS TRUSTEES, DIRECTORS, OFFICERS, EMPLOYEES AND AFFILIATES BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING ECONOMIC DAMAGES OR INJURY TO PROPERTY AND LOST PROFITS, REGARDLESS OF WHETHER COMPANY OR AEI SHALL BE ADVISED, SHALL HAVE OTHER REASON TO KNOW, OR IN FACT SHALL KNOW OF THE POSSIBILITY OF THE FOREGOING.

10.2. <u>Compliance with Law and Confidentiality Agreement</u>. Each of Company and AEI agrees to comply with all applicable law and the Confidentiality Agreement dated April 7, 1999 between Company and AEI. The Confidentiality Agreement shall be deemed a material part of this Agreement in respect to the AEI Technology and is herein incorporated and made a part of this Agreement by reference. All reasonable precautions shall be taken by the parties to insure compliance with the terms and conditions of said Confidentiality Agreement. Company is authorized to make to contractors such disclosures acceptable to AEI as may be necessary for making Licensed Product, but only after such contractors have agreed in writing to the satisfaction of AEI, to be bound by the obligations of the Confidentiality Agreement referred to herein and §1.12 to the same extent as Company.

10.12.   **Entire Agreement.** Except for the Confidential Agreement referred to in §1.11 and §10.2, this Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements or understandings between the parties relating to its subject matter

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives on the date(s) set forth below.

APPLIED ELASTOMERICS, INC. ("AEI")

By: _____

Name: _____John Y. Chen_____

Title: _____President_____

Date: _____July 18, 2001_____

ATTEST: _____
Secretary

(Seal)

Z-MAN PRODUCTS, INC. ("Company")

By: _____

Name: __MICHAEL T SHELTON__

Title: ____VICE PRESIDENT____

Date: _____July 24 2001_____

ATTEST: _____
Secretary

(Seal)

11

SCHEDULE B
List of Licensed Products and New Licensed Products by Item Number

Product No. 1: a fishing lure made from Crystalline poly(styrene-ethylene-ethylene-propylene-styrene) gel or SEEPS gel.
Restricted under §2.2(a).
Marketing §3.1 (c) date: by January 1, 2002.
Licensed Product sample Item No.: _____

END OF SCHEDULE B

SCHEDULE A

I. List of AEI Patents

1. U.S. Patent No. 5,884,639, "CRYSTAL GELS WITH IMPROVED PROPERTIES", issued March 23, 1999.

2. U.S. Patent No. 6,117,176, "ELASTIC CRYSTAL GEL", issued Sep. 12, 2000.

3. U.S. Patent No. 6,148,830, "TEAR RESISTANT, MULTIBLOCK COPOLYMER GELS AND ARTICLES", Issued Nov. 21, 2000.

4. U.S. Patent No. 6,161,555, "CRYSTAL GELS USEFUL AS DENTAL FLOSS WITH IMPROVED HIGH TEAR, HIGH TENSILE, AND RESISTANCE TO HIGH STRESS RUPTURE PROPERTIES", issued Dec. 19, 2000.

FROM :    FAX NO. :    May. 15 2001 09:37AM P12

# EXHIBIT B

## AMENDMENT NUMBER 1
## TO PATENT LICENSE AGREEMENT

THIS AMENDMENT AGREEMENT ("Amendment") is made and entered into this __ day of March, 2002, effective April 26, 2001, by and between Applied Elastomerics, Incorporated, a California corporation with its principal place of business at 163 West Harris Avenue, South San Francisco, California 94080 ("'AEI") and Z-Man Fishing Products, Inc., a South Carolina corporation with its principal place of business at 911 Commerce Circle, Hanahan, South Carolina 29406 ("Company").

### WITNESSETH:

WHEREAS, AEI and Company entered into that certain Patent License Agreement with an effective date of April 26, 2001 regarding the patent rights to certain compositions, composites and articles more fully described therein ("Patent License Agreement"); and

WHEREAS, AEI and Company now, as allowed under the terms of the Patent License Agreement with each being in compliance with the existing terms, desire to modify the Patent License Agreement as set forth below.

NOW, THEREFORE, for and in consideration of the promises and covenants set forth in this Amendment and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, AEI and Company agree as follows:

1. Section 3 (Company Obligations Relating to Commercialization) of the Patent License Agreement is hereby amended to delete the existing Paragraph 3.1(b) and to substitute in its place the following new Paragraph 3.1(b):

(b) **Company shall use its best efforts to obtain a commercial order of a Licensed Product during the first calendar quarter of 2002 or within the twelve-month period from any New Licensed Product Date as specified on the applicable Schedule B.**

2. Section 3 (Company Obligations Relating to Commercialization) of the Patent License Agreement is hereby amended to delete the existing Paragraph 3.1(c) and to substitute in its place the following new Paragraph 3.1(c):

(c) Company shall make Net Revenues from Licensed Products as described in Schedule B marked "Restricted under §2.2(a)" according to the following schedule:

| Year | 1st QUARTER | 2ND QUARTER | 3RD QUARTER | 4TH QUARTER |
|---|---|---|---|---|
| 2002 | $ 150,000.00 | $ 150,000.00 | $ 150,000.00 | $ 150,000.00 |
| 2003 | $ 500,000.00 | $ 500,000.00 | $ 500,000.00 | $ 500,000.00 |
| 2004 | $ 750,000.00 | $ 750,000.00 | $ 750,000.00 | $ 750,000.00 |
| 2005 | $1,250,000.00 | $1,250,000.00 | $1,250,000.00 | $1,250,000.00 |

each year thereafter at least $5,000,000.

3.  Section 4 (Consideration for Grant of Rights) of the Patent License Agreement is hereby amended to delete the existing Paragraph 4.6(a) and to substitute in its place the following new Paragraph 4.6(a):

(a)  Except as provided in §4.6(b), Company shall pay to AEI from the Effective Date of this Agreement the minimum royalties to be paid each calendar quarter as follows:

| Year | 1st QUARTER  | 2nd QUARTER  | 3rd QUARTER  | 4th QUARTER  |
|------|--------------|--------------|--------------|--------------|
| 2002 | $ 12,500.00  | $ 12,500.00  | $ 12,500.00  | $ 12,500.00  |
| 2003 | $ 40,000.00  | $ 40,000.00  | $ 40,000.00  | $ 40,000.00  |
| 2004 | $ 60,000.00  | $ 60,000.00  | $ 60,000.00  | $ 60,000.00  |
| 2005 | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 | $ 100,000.00 |

and thereafter One Hundred Thousand Dollars ($100,000.00) for each calendar quarter for the remainder of the term of this Agreement and any extensions thereof. Such minimum shall not apply to include the sell-off period provided by §8.6 upon termination of this Agreement.

Except to the extent the Patent License Agreement is amended as expressly noted in this Amendment, the Patent License Agreement shall remain in full force and effect.

[CORPORATE SEAL]                    AEI:

                                    Applied Elastomerics, Incorporated, a California corporation

ATTEST: _____      By: _____

                                    Its:

[CORPORATE SEAL]                    COMPANY:

                                    Z-Man Fishing Products, Inc., a South Carolina corporation

ATTEST: _____      By: _Michael [signature]_
                                    Its: _VICE-PRESIDENT_

# EXHIBIT C

## CONFIDENTIALITY AGREEMENT

This Agreement, effective as of April 26, 2001 (the "Effective Date") is between Applied Elastomerics, Incorporated ("AEI"), a California corporation, with its principal place of business at 163 West Harris Avenue, South San Francisco, CA 94080 and Z-Man Fishing Products, Incorporated ("Company"), a South Carolina corporation, with its principal place of business at 911 Commerce CR, Hanahan, SC 29407., and establishes the terms and conditions of planned disclosures of Confidential Information between the parties.

1. The parties agree that all information obtained from the other, including without limitation, ideas, inventions, materials, any information relating to manufacturing techniques, know-how, processes, algorithms, developments, experimental works, works in progress, products, trade secrets, scripts, characters, artwork, story lines or any other matter relating to artistic creations or the business of each party, information acquired by a party from the other's employees or inspection of a parties property, proprietary information disclosed to a party by third parties, together with any material prepared by a party which contains or otherwise relates to such information or any information relating to transactions and/or meetings between the parties shall be deemed "Confidential Information". The right and title to Confidential Information shall remain in the Disclosing party. Written Confidential Information shall be marked "Proprietary Information". Any orally conveyed Confidential Information shall be memorialized in writing within thirty (30) days of disclosure and marked "Proprietary Information", "Secret", or Confidential Information".

2. The parties agree that after the date of any disclosure they will not reveal the Confidential Information obtained to others, except to the extent that it is necessary to disclose such Confidential Information to representatives and employees having a need to know such Confidential Information, and only to those representatives and employees who will be bound by this Confidentiality Agreement, for the sole and express purpose of evaluating a possible transaction, or carrying out an agreed upon activity, between the parties. Each party agrees it will take steps to maintain the confidentiality of said Confidential Information equivalent to those it takes to maintain the confidentiality of its own proprietary information.

3. No other use or disclosure of the Confidential Information shall be made by a party without the prior written consent of the other party. Upon request, the Confidential Information and all copies, photographs, and transcriptions thereof shall be returned to the requesting party, or at the requesting party's election, destroyed.

4. Each party agrees that all analyses compilations, studies or other documents or materials prepared in whole or in part, or services to be performed by a party, its representatives or employees ("work product") which mention or use Confidential Information will be kept confidential under the terms of this Confidentiality Agreement, or such work product will be destroyed if so requested by the party owning the work product.

5.  Without the other party's prior written consent, no party shall issue or authorize the dissemination of any publicity or news story relating to (i) the Confidential Information disclosed under this Confidentiality Agreement, (ii) any agreement with the other party; and (iii) any services performed in connection with Confidential Information disclosed under this Confidentiality Agreement.

6.  Except for the limited right to use granted in paragraph 2 above, no right or license either express or implied under any mask work, patent, copyright, trade secret, or proprietary information is granted hereunder.

7.  Neither party makes any warranty or representation as to the accuracy or completeness of the information disclosed. In no event shall either party be liable for incidental or consequential damages based on this agreement or information transferred hereunder.

8.  It is understood by the parties that the Confidential Information disclosed shall not be subject to this confidentially Agreement if such Information is:

(a) in the public domain, or (b) known to a party prior to disclosure by the other and the party can establish such prior knowledge by competent documentation, or (c) disclosed to a party by a third party subsequent to disclosure pursuant to the Confidentiality Agreement, and such disclosure by the third party is not in violation of any confidentiality agreement or obligation between the parties, or (d) is independently developed by the receiving party, by persons without access to the Confidential Information. Confidential Information shall not be deemed within the foregoing exceptions if (i) specific and merely embraced by more general information in the public domain or recipient's possession, or (ii) a novel combination which can be pieced together to reconstruct the Confidential Information from multiple sources, none of which shows the whole combination, its principle of operation and method of use.

9.  It is expressly understood that any disclosure hereunder is not a public use or disclosure, or sale or offer for sale, of any product, equipment, process or service.

10. This Confidentially Agreement shall be deemed a material part of any agreement entered into between the parties in respect of the Confidential Information, All reasonable precautions shall be taken by the parties to insure compliance with the terms and conditions of this Confidentiality Agreement.

| APPLIED ELASTOMERICS, INC. ("AEI") | Z-MAN FISHING PRODUCTS, INC. ("Company") |
|---|---|
| By: _John Y. Chen_ (signature) | By: _____ |
| Name: _John Y. Chen_ | Name: _Mike Shelton_ |
| Title: _President_ | Title: _____ |
| Date: _April 26, 2001_ | Date: _____ |